## DAVID CIARLELLI *v.* TOWN OF HAMDEN ET AL.
## (SC 18201)

Rogers, C. J., and Norcott, Katz, Palmer and Zarella, Js.*

* This case was argued prior to the implementation of the policy of this court to hear all cases en banc.

Argued January 9, 2009—officially released December 21, 2010

*Andrew J. Morrissey*, with whom was *Jill Morrissey*, for the appellant (plaintiff).

*Jason M. Dodge*, with whom was *Heather K. Porto*, for the appellees (defendants).

*Opinion*

PALMER, J. This appeal requires us to determine when the one year limitation period of General Statutes § 31-294c (a)[1] begins to run on a claim for hypertension benefits under General Statutes § 7-433c.[2] The plaintiff,

_____

[1] General Statutes § 31-294c provides in relevant part: "(a) No proceedings for compensation under the provisions of this chapter shall be maintained unless a written notice of claim for compensation is given within one year from the date of the accident or within three years from the first manifestation of a symptom of the occupational disease, as the case may be, which caused the personal injury . . . ."

[2] General Statutes § 7-433c provides in relevant part: "(a) Notwithstanding any provision of chapter 568 or any other general statute, charter, special act or ordinance to the contrary, in the event a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment,

David Ciarlelli, appeals[3] from the decision of the compensation review board (board), which affirmed the decision of the workers' compensation commissioner for the third district (commissioner) dismissing the plaintiff's claim for hypertension benefits under § 7-433c as untimely because the plaintiff had failed to file his claim within one year of what the commissioner characterized as "documented, elevated hypertensive blood pressure readings . . . ." The plaintiff contends that, for purposes of determining when the one year limitation period of § 31-294c commenced, the board improperly treated his hypertension as an accidental injury definitely located in time and place, a claim for which must be filed within one year of that date, rather than a repetitive trauma injury, a claim for which generally need not be brought until one year from the last day of the claimant's employment. The plaintiff further contends that the board incorrectly concluded that a

and from the municipal or state retirement system under which he is covered, he or his dependents, as the case may be, shall receive the same retirement or survivor benefits which would be paid under said system if such death or disability was caused by a personal injury which arose out of and in the course of his employment, and was suffered in the line of duty and within the scope of his employment. If successful passage of such a physical examination was, at the time of his employment, required as a condition for such employment, no proof or record of such examination shall be required as evidence in the maintenance of a claim under this section or under such municipal or state retirement systems. The benefits provided by this section shall be in lieu of any other benefits which such policeman or fireman or his dependents may be entitled to receive from his municipal employer under the provisions of chapter 568 or the municipal or state retirement system under which he is covered, except as provided by this section, as a result of any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability. . . ."

Chapter 568 of the General Statutes contains the Workers' Compensation Act, General Statutes § 31-275 et seq. Thus, in accordance with § 7-433c, claims filed thereunder are governed by the procedures outlined in the Workers' Compensation Act.

[3] The plaintiff appealed to the Appellate Court from the decision of the compensation review board, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

claimant seeking benefits for hypertension under § 7-433c must file a notice of claim within one year from the date that the claimant knew or should have known that he had symptoms of hypertension, rather than within one year from the date that he was informed by a medical professional that he suffers from hypertension. Although we reject the plaintiff's first claim, we agree with his second claim and, accordingly, reverse the decision of the board.

The record reveals the following undisputed facts and procedural history. The plaintiff was hired by the named defendant, the town of Hamden,[4] as a police officer in 1982, and he remained a regular member of the Hamden police department until his retirement in August, 2004. When he was hired, the plaintiff passed a preemployment physical that did not reveal any evidence of hypertension or heart disease. In 1996, after the death of his treating physician, the plaintiff began seeing another physician, Paul Monaco, who remained his physician until the plaintiff's retirement in 2004. Between 1996 and 2004, the plaintiff visited Monaco on numerous occasions, and Monaco usually measured the plaintiff's blood pressure at those visits. According to Monaco, the plaintiff's blood pressure frequently was either normal or "borderline" for hypertension.[5] The

---

[4] Connecticut Interlocal Risk Management Agency, the heart and hypertension administrator for the town of Hamden at all relevant times, also is a defendant. In the interest of simplicity, we hereinafter refer to the town of Hamden as the defendant.

[5] According to the Mayo Foundation for Medical Education and Research, the latest blood pressure guidelines divide blood pressure measurements into four general categories: normal blood pressure, prehypertension, stage 1 hypertension and stage 2 hypertension. Blood pressure is normal if it is below 120/80 millimeters of mercury, where the first number is the *systolic* pressure, or the pressure in a person's arteries when the heart beats, and where the second number is the *diastolic* pressure, or the pressure in a person's arteries in between heartbeats. Prehypertension is a systolic pressure between 120 and 139 millimeters of mercury or a diastolic pressure between 80 and 89 millimeters of mercury. Stage 1 hypertension is a systolic pressure between 140 and 159 millimeters of mercury or a diastolic pressure between 90 and 99 millimeters of mercury. The most severe hypertension,

plaintiff's highest readings were associated with particularly stressful situations, either work-related or otherwise. For example, in February, 1999, the plaintiff was sprayed with pepper spray during a training exercise at work and, thereafter, registered a blood pressure reading of 220/130; on another occasion in March, 2002, the plaintiff discovered a lump in his groin and registered a blood pressure reading of 160/100.[6] Beginning in late 2000, Monaco advised the plaintiff to monitor his blood pressure at home and to watch his weight and to diet. When the plaintiff measured his own blood pressure at home, his readings usually were in the normal range, leading Monaco to conclude that the plaintiff suffered from "white coat effect," a term used to describe a patient's elevated blood pressure readings, when those readings are taken at a physician's office, due to the patient's anxiety about being seen by a physician. In early May, 2004, the plaintiff developed a severe headache and sought treatment at a hospital emergency department. His blood pressure at that time was abnormally high, and it remained elevated the next day when he visited Monaco's office. At that point, Monaco decided to put the plaintiff on Monopril, a prescription antihypertensive medication.

The plaintiff filed a notice of claim for hypertension benefits on May 20, 2004. A hearing on his claim was

stage 2 hypertension, is a systolic pressure of 160 millimeters of mercury or higher or a diastolic pressure of 100 millimeters of mercury or higher. Mayo Foundation for Medical Education and Research, "High Blood Pressure (Hypertension): Test and Diagnosis" (August 6, 2010), available at http://www.mayoclinic.com/health/high-blood-pressure/DS00100/DSECTION=tests-and-diagnosis (last visited December 6, 2010).

[6] According to the record, the plaintiff registered the following *additional* blood pressure readings between November, 1996, and May, 2004, at various appointments with Monaco: 140/90 and 128/88 on November 6, 1996; 138/80 on February 25, 1998; 130/88 on February 15, 1999; 150/96 and 148/92 on December 11, 2000; 128/80 and 132/84 on December 18, 2000; 144/92 and 144/88 on January 22, 2001; 132/88 on March 26, 2001; 140/92 on March 25, 2002; 148/90 on September 25, 2002; and 154/82 and 150/82 on March 24, 2003.

held on November 29, 2005, at which the plaintiff intro-
duced into evidence the deposition testimony of
Monaco, who stated that he did not consider the plain-
tiff to be hypertensive until May 11, 2004, because, prior
to that date, the plaintiff's blood pressure never was
"consistently elevated . . . ." The plaintiff testified at
the hearing that Monaco never had informed him, prior
to May 11, 2004, that he was hypertensive. The plaintiff
further testified that he never had noted any consis-
tently high blood pressure readings when he took his
own blood pressure at home. When the plaintiff was
asked if he had been aware of the Heart and Hyperten-
sion Act[7] during his tenure as a police officer, he
responded in the affirmative. When questioned why,
given that awareness, he had not filed a notice of claim
prior to May 11, 2004, the plaintiff responded: "I'm not
a doctor. I have to put my trust in my doctor and [in]
what he tells me. He never told me I was hypertensive,
and I don't have the schooling to dispute him other-
wise." Finally, the plaintiff testified that, when Monaco
recommended that he lose weight or make changes to
his diet, Monaco did not mention high blood pressure
as the reason for the recommendation.

The defendant introduced into evidence the deposi-
tion testimony of Martin Krauthamer, a cardiologist
whom the defendant had retained to review the plain-
tiff's medical file. Krauthamer testified that, in his medi-
cal opinion, the plaintiff had documented hypertensive
blood pressure readings in December, 2000, January,
2001, March, 2002, and March, 2003. On the basis of
Krauthamer's testimony, the commissioner dismissed
the plaintiff's claim as untimely because the plaintiff
had failed to file a notice of claim for benefits within
one year of the hypertensive blood pressure readings
identified by Krauthamer.

---

[7] Section 7-433c is commonly referred to as the Heart and Hyperten-
sion Act.

Following the commissioner's decision, the plaintiff filed a motion to correct the commissioner's findings and a motion for articulation. In his motion to correct, the plaintiff requested, inter alia, that the commissioner supplement his decision to include a finding that, although Monaco had discussed the plaintiff's blood pressure with him prior to May, 2004, the term "hypertension" did not appear anywhere in the plaintiff's medical records prior to May 11, 2004, and, further, that there was no evidence that Monaco ever had communicated a diagnosis of hypertension to the plaintiff before that date. The plaintiff also requested a finding that Krauthamer's medical opinions cannot be imputed to the plaintiff retroactively so as to constitute notice to him that he was suffering from hypertension prior to May 11, 2004. The commissioner denied the plaintiff's motion to correct.

In his motion for articulation, the plaintiff sought an explanation of whether, for purposes of applying the one year limitation period of § 31-294c, the commissioner had considered the plaintiff's hypertension to be an "accidental injury [that] may be definitely located in time and place" or a "repetitive trauma" injury.[8] The plaintiff also sought an articulation of whether the commissioner had found that, prior to May 11, 2004, the plaintiff was aware of an actual diagnosis of hypertension, or merely was aware of symptoms indicative of a potential diagnosis in the future.

In response to the plaintiff's motion for articulation, the commissioner made the following articulation: "The

---

[8] We note that, for purposes of the Workers' Compensation Act, the term "personal injury" or the term "injury" "includes, in addition to accidental injury that may be definitely located as to the time when and the place where the accident occurred, an injury to an employee that is causally connected with the employee's employment and is the direct result of repetitive trauma or repetitive acts incident to such employment, and occupational disease." General Statutes § 31-275 (16) (A).

[plaintiff] received repeated advice from his treating physician that he had elevated and/or borderline blood pressure readings in December, 2000, January, 2001, March, 2002, September, 2002, and March 2003. . . . Monaco had advised the [plaintiff] several times between December, 2000, and March, 2003, about watching his diet, losing weight, monitoring his blood pressure at home and making lifestyle changes. The [plaintiff] had, therefore, been alerted by . . . Monaco of a potential claim for hypertension benefits which, under . . . [§] 7-433c, requires the claimant to notify the employer of a potential claim under [General Statutes §] 31-294b and to file a notice of claim under . . . [§] 31-294c.

"The repeated elevated blood pressure readings between December, 2000, and March, 2003, makes the notice of claim in May, 2004, untimely because it is more than one year after the claim should have been filed.

"[Krauthamer's] expert opinion as a cardiologist was acknowledged to verify the finding that the multiple, elevated blood pressure readings by . . . Monaco should have alerted the [plaintiff] to file a potential claim for hypertension benefits."

The plaintiff appealed from the decision of the commissioner to the board, which, in a split decision, affirmed the commissioner's decision. In so doing, the board surveyed the relevant case law pertaining to when a notice of claim under § 7-433c must be filed. The board acknowledged that its perspective on the issue had changed over time and that, until several years ago, a claimant generally was required to file a notice of claim only when the disease became "disabling," which was defined by the need for medical care, including prescription medication. The board noted, however, that, in *Pearce* v. *New Haven*, 76 Conn. App. 441, 450, 819 A.2d 878, cert. denied, 264 Conn. 913, 826 A.2d 1155

(2003), the Appellate Court had endorsed an approach that requires a claimant to file a notice of claim when he becomes aware that he has symptoms of hypertension. The board further noted that, in *Arborio* v. *Windham Police Dept.*, 103 Conn. App. 172, 177, 928 A.2d 616 (2007), the Appellate Court, although reversing the decision of the board in that case, nevertheless purported to reaffirm the standard that it had applied in *Pearce.* The board thus concluded: "[T]he § 7-433c case law establishes that a claimant is required to notify his or her employer of a potential claim for benefits by filing a notice of claim when (1) the medical evidence shows that he or she has developed symptoms of hypertension, and (2) he or she knows, or should know, that he or she has symptoms of hypertension that may require lifestyle changes and/or treatment (whether or not disability yet exists)."

In reaching its decision, the board rejected the plaintiff's claim that, for purposes of applying the one year limitation period of § 31-294c, hypertension is more properly classified as a repetitive trauma rather than an accidental injury, even though, as the plaintiff maintained, medical evidence demonstrates that high blood pressure conditions tend to evolve over time, often due to the aging process. In addressing this claim, the board first noted that no decision of this court or the Appellate Court ever had treated a claim for heart and hypertension benefits under § 7-433c as a claim for a repetitive trauma injury. The board further noted that the plaintiff had not alleged any facts or presented any evidence to support a finding that his hypertension constituted a repetitive trauma injury. The board then explained that an award under § 7-433c, unlike benefits awarded under the Workers' Compensation Act, General Statutes § 31-275 et seq., does not require proof of a causal connection between a claimant's heart or hypertension condition and his or her employment. In contrast, a repetitive

trauma injury is defined under the Workers' Compensation Act as an injury "causally connected with the employee's employment and . . . the direct result of repetitive trauma or repetitive acts incident to . . . employment . . . ." General Statutes § 31-275 (16) (A). The board concluded, therefore, that to treat hypertension as a repetitive trauma injury would have required it to presume a causal relationship between the plaintiff's employment and his hypertension, in contravention of the plain meaning of § 31-275 (16) (A) and this court's decision in *Ducharme* v. *Putnam*, 161 Conn. 135, 143, 285 A.2d 318 (1971) (holding unconstitutional conclusive presumption under General Statutes [Sup. 1969] § 7-433a, predecessor statute to § 7-433c, that hypertension and heart disease were causally connected to police officer or firefighter's employment).[9] Finally, the board observed that, if the plaintiff had wished to proceed under a repetitive trauma theory of recovery, he could have filed a claim under the Workers' Compensation Act and introduced evidence establishing a causal connection between his disease and his employment.

One of the three members of the board in the present case, Commissioner Donald H. Doyle, dissented from the board's decision. In his view, the evidence did not support a finding that the claimant had sufficient information prior to May, 2004, to put him on notice that his elevated blood pressure readings were symptoms of hypertension. Doyle reasoned that, even if the commissioner properly had concluded that Monaco possessed sufficient information to have diagnosed the

---

[9] "[Section] 7-433c, as amended, was enacted in 1971 in response to *Ducharme* v. *Putnam*, [supra, 161 Conn. 135, in which] this court held that the conclusive presumption prescribed by General Statutes [Sup. 1969] § 7-433a was in contravention of the due process clauses of both the state and federal constitutions. Thereafter, the validity of § 7-433c was sustained in *Grover* v. *Manchester*, 168 Conn. 84, 357 A.2d 922, appeal dismissed, 423 U.S. 805, 96 S. Ct. 14, 46 L. Ed. 2d 26 (1975)." *Bakelaar* v. *West Haven*, 193 Conn. 59, 67–68, 475 A.2d 283 (1984).

plaintiff with hypertension at some point between 2000 and 2003, there was nothing in the record to indicate that Monaco had communicated that information to the plaintiff, thereby providing the plaintiff with personal knowledge that he was suffering from hypertension.

On appeal, the plaintiff renews his claim that hypertension should be treated as a repetitive trauma injury for purposes of applying the one year limitation period of § 31-294c. In the alternative, the plaintiff contends that, even if hypertension properly is treated as an accidental injury definitely located in time and place for purposes of § 31-294c, the board improperly concluded that the one year limitation period applicable to such injuries started to run when the plaintiff knew or should have known that he had symptoms of hypertension. The plaintiff maintains, rather, that, although a notice of claim for benefits under § 7-433c *may* be filed when symptoms of hypertension first appear, the limitation period does not begin to run until the claimant has been informed by a medical professional that he suffers from hypertension. We conclude that the board properly applied the one year limitation period for accidental injury definitely located in time and place to the plaintiff's claim. We further conclude, however, that that period did not begin to run until Monaco indicated to the plaintiff that he suffered from hypertension in May, 2004.

The following legal principles guide our analysis of the plaintiff's claims. "It is well settled that the 'special compensation,' or the 'outright bonus,' of § 7-433c 'is that the claimant is not required to prove that the heart disease is causally connected to [his or her] employment, which he [or she] would ordinarily have to establish in order to receive benefits pursuant to the Workers' Compensation Act.' . . . The benefits provided under § 7-433c are, however, payable and administered under the Workers' Compensation Act . . . and 'the type and

amount of benefits available pursuant to § 7-433c are the same as those under the Workers' Compensation Act . . . .' " (Citations omitted.) *O'Connor* v. *Waterbury*, 286 Conn. 732, 752, 945 A.2d 936 (2008); see also *Genesky* v. *East Lyme*, 275 Conn. 246, 252 n.9, 881 A.2d 114 (2005) ("[a]lthough an award of benefits under § 7-433c is not a workers' compensation award, the Workers' Compensation Act is used as a 'procedural avenue' for the administration of benefits under § 7-433c").

"Cases that present pure questions of law . . . invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Internal quotation marks omitted.) *Chambers* v. *Electric Boat Corp.*, 283 Conn. 840, 844, 930 A.2d 653 (2007). There has been no prior judicial scrutiny or time-tested interpretation of § 31-294c with regard to when the statute of limitations begins to run on a claim brought pursuant to § 7-433c. Indeed, as we subsequently explain, until recently, the board construed § 31-294c as requiring notice of a claim only when the disease became disabling, rather than when a person knew or should have known that he had symptoms of the disease. "Accordingly, our statutory analysis accords no deference to the board's interpretation . . . ." (Internal quotation marks omitted.) Id.

When interpreting the statutory provisions at issue in the present case, we are mindful of "the proposition that all workers' compensation legislation, because of its remedial nature, should be broadly construed in favor of disabled employees. . . . This proposition

applies as well to the provisions of [§] 7-433c . . . because the measurement of the benefits to which a § 7-433c claimant is entitled is identical to the benefits that may be awarded to a [claimant] under . . . [the Workers' Compensation Act]." (Citations omitted; internal quotation marks omitted.) *Szudora* v. *Fairfield*, 214 Conn. 552, 557–58, 573 A.2d 1 (1990). "We also recognize, however, that the filing of a timely notice of claim is a condition precedent to liability and a jurisdictional requirement that cannot be waived. . . .

"When interpreting a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. General Statutes § 1-2z." (Internal quotation marks omitted.) *Chambers* v. *Electric Boat Corp.*, supra, 283 Conn. 844–45.

It is settled that, because General Statutes § 7-433c (a) does not set forth a limitation period for filing a claim but provides for the administration of benefits "in the same amount and the same manner as that provided under [the Workers' Compensation Act] if such death or disability was caused by a personal injury which arose out of and in the course of his employment," the one year limitation period of § 31-294c (a) governs claims filed under § 7-433c. General Statutes § 31-294c provides in relevant part: "(a) No proceedings for compensation under the provisions of this chapter shall be maintained unless a written notice of claim for compensation is given within one year from the date of the accident or within three years from the first manifestation of a symptom of the occupational dis-

ease, as the case may be, which caused the personal injury . . . ."

The plaintiff never has claimed that his hypertension constitutes an occupational disease. Therefore, even though it is undisputed that the plaintiff was required to file his claim within one year of the time of injury, it is not clear whether hypertension should be treated as a traditional accidental injury or as a repetitive trauma injury and, in either case, what constitutes the date of injury for purposes of triggering the commencement of that one year period.[10] Because the language of § 31-294c provides no guidance as to when the one year limitation period begins to run on a claim brought pursuant to § 7-433c, to answer that question, we "apply our well established process of statutory interpretation, under which we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . ." (Internal quotation marks omitted.) *Chambers* v. *Electric Boat Corp.*, supra, 283 Conn. 845. "In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation

---

[10] "In workers' compensation *cases the distinction between an accidental* injury and one caused by repetitive trauma could be very important to the timeliness of a claim for benefits. Accidental injuries, not the result of repetitive trauma, are those injuries that may be definitely located as to the time when and the place where the accident occurred . . . . *Russell* v. *Mystic Seaport Museum, Inc.*, 252 Conn. 596, 613, 748 A.2d 278 (2000). By contrast, the process of injury from a repetitive trauma is ongoing until [the last date of exposure] . . . and, in many cases . . . the very nature of the injury will make it impossible to demarcate a specific date of injury. . . . Id." (Internal quotation marks omitted.) *Arborio* v. *Windham Police Dept.*, supra, 103 Conn. App. 173–74 n.2. As a consequence, the date of injury in a repetitive trauma case is deemed to be the last date of exposure to the circumstances causing the injury, which "often coincides with" the claimant's last date of employment. *Malchik* v. *Division of Criminal Justice*, 266 Conn. 728, 745, 835 A.2d 940 (2003).

and common law principles governing the same general subject matter. . . . We have previously recognized that our construction of the [Workers' Compensation Act] should make every part operative and harmonious with every other part insofar as is possible . . . . In applying these principles, we are mindful that the legislature is presumed to have intended a just and rational result." (Internal quotation marks omitted.) Id.

I

The plaintiff first claims that the board incorrectly concluded that his hypertension is an accidental injury definitely located in time and place, rather than a repetitive trauma injury, for purposes of applying the one year limitation period of § 31-294c. As we previously observed; see footnote 10 of this opinion; whether an injury is classified as accidental or as a repetitive trauma can be determinative of whether a claim is timely under § 31-294c. In the present case, although the plaintiff does not dispute that he failed to present evidence of a causal link between his hypertension and his employment, he contends that *Malchik* v. *Division of Criminal Justice*, 266 Conn. 728, 744–45, 835 A.2d 940 (2003), supports the conclusion that hypertension presumptively should be treated as a repetitive trauma injury for purposes of computing the limitation period of § 7-433c. We disagree with the plaintiff's reading of *Malchik*. Indeed, as we explain more fully hereinafter, *Malchik* supports the board's determination that hypertension cannot be treated as a repetitive trauma injury under § 7-433c because it would require the commissioner to presume jurisdictional facts not in evidence, in contravention of §§ 31-294c and 7-433c and this court's decisional law interpreting those statutory provisions.

The primary issue in *Malchik* was whether the board properly had affirmed the determination of the workers' compensation commissioner for the second district that

there was insufficient evidence to support a finding that the coronary artery disease of the plaintiff, Michael W. Malchik, was an occupational disease within the meaning of § 31-275 (15).[11] Id., 730. Malchik, a former inspector with the state division of criminal justice, retired from state service on September 30, 1998, and, approximately thirteen months later, filed a claim for benefits under General Statutes §§ 5-145a and 5-145c. See id., 732, 737 nn.9 and 10. Like § 7-433c, §§ 5-145a and 5-145c provide benefits for disability relating to hypertension or heart disease for certain state employees. Malchik sought reversal of the board's decision that the commissioner properly had determined that Malchik's claim was untimely because he had not brought it within one year of the date that he suffered his injury. See id., 730–31. He contended that the three year limitation period that governs occupational disease claims applied or, in the alternative, that the one year period for repetitive trauma injuries, which, in many cases, does not begin to run until the last day of the claimant's employment, was applicable. See id.

With respect to the first claim, we concluded that, although "§§ 5-145a and 5-145c provide that hypertension or heart disease 'shall be presumed to have been suffered in the performance of [the inspector's] duty' "; id., 738; "[t]hese rebuttable presumptions apply only to the question of causation . . . and not to the jurisdictional question of whether a disease is an occupational disease subject to the three year limitation period set forth in § 31-294c." Id. We therefore reasoned that, to invoke the longer limitation period applicable to occupational diseases, Malchik was required to demonstrate

---

[11] General Statutes § 31-275 (15) defines "occupational disease" as "any disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such, and includes any disease due to or attributable to exposure to or contact with any radioactive material by an employee in the course of his employment."

that his coronary artery disease constituted an occupational disease for purposes of the Workers' Compensation Act. See id. We concluded that Malchik had failed to do so because, "[a]lthough the record reveal[ed] that [he] offered evidence to prove that he personally suffered coronary artery disease as a result of stress from his job, he failed to offer evidence that this stress and resulting disease were 'peculiar to' or so 'distinctively associated with . . . [Malchik's] occupation that there is a direct causal connection between the duties of the employment and the disease contracted.' " Id., 735–36. We also rejected Malchik's alternative claim that the commissioner improperly had failed to treat his claim as one involving a repetitive trauma injury. Id., 744. We concluded that, even if Malchik's coronary artery disease could be considered a repetitive trauma injury, his claim for benefits still would have been untimely because he had not filed it within one year of his last date of employment and that one year period did not extend beyond that date. See id., 744–75.

Significantly, for purposes of the present case, we supported our conclusion in *Malchik* by observing that a claimant is not entitled to a presumption that his heart disease constitutes an occupational disease for purposes of computing the limitation period under § 7-433c. See id., 740. In particular, we explained that, "with respect to both § 7-433c and §§ 5-145a and 5-145c, the underlying legislative purpose was social rather than medical. More specifically, the legislature's intent [in enacting all three statutes] was to afford the named occupations with . . . [special compensation] when, under the appropriate conditions, the employee suffered heart disease or hypertension. See, e.g., *Carriero* v. *Naugatuck*, 243 Conn. 747, 754, 707 A.2d 706 (1998) (payments pursuant to § 7-433c constitute special compensation, or even an outright bonus, to qualifying policemen and firemen). That does not mean, however

. . . that the legislature also intended to afford those occupations with the additional benefit resulting from a declaration of heart disease and hypertension as an occupational disease. This conclusion is buttressed by our recognition that, although occupational disease has long been a recognized concept in workers' compensation law, the legislature has not included heart disease or hypertension within that concept." (Internal quotation marks omitted.) *Malchik* v. *Division of Criminal Justice*, supra, 266 Conn. 740; see also *Plainville* v. *Travelers Indemnity Co.*, 178 Conn. 664, 673, 425 A.2d 131 (1979) ("[a]lthough the preamble to . . . § 7-433c indicates a legislative recognition of the risks to which policemen and firemen are exposed, including an unusually high degree of susceptibility to heart disease and hypertension, we do not construe such language as the equivalent of a legislative finding that all heart ailments suffered by firemen and policemen are causally related to their employment"); *Zaleta* v. *Fairfield*, 38 Conn. App. 1, 7–8, 658 A.2d 166 ("[T]he [claimant] . . . relied only on the language of § 7-433c, claiming that it evinces legislative recognition of heart disease and hypertension as occupational diseases vis-á-vis police officers and firefighters. . . . [T]he [board], therefore, had no evidence before it that hypertension is an occupational disease and its finding that the [claimant's] claim was subject to the three year statute of limitations cannot stand." [Citations omitted.]), cert. denied, 234 Conn. 917, 661 A.2d 98 (1995).

Notably, in *Malchik*, this court did not deem it relevant, for purposes of determining the applicable limitation period, whether coronary artery disease was more like an occupational disease, a repetitive trauma injury or an accidental injury. Rather, the court looked to the definitions of those terms under the Workers' Compensation Act, and we see no reason to deviate from that

mode of analysis in the present case.[12] Under the Workers' Compensation Act, a repetitive trauma injury, like occupational disease, requires proof of a causal connec-

[12] We readily acknowledge that even an accidental injury definitely located in time and place requires some proof of a causal connection to employment because the injury must "arise out of and in the course of the claimant's employment." *Birnie* v. *Electric Boat Corp.*, 288 Conn. 392, 407, 953 A.2d 28 (2008). Because, however, such an injury requires the least causal proof under the Workers' Compensation Act, by necessity, it has come to serve as the default category for § 7-433c claims, which, as we previously explained, require no proof of causation. When the legislature enacted § 7-433c in 1971, it directed that benefits under the provision be awarded in the same amount and in the same manner as those awarded under the Workers' Compensation Act. See Public Acts 1971, No. 524, § 1. The legislature did not specify, however, what limitation period set forth in the Workers' Compensation Act—that is, the limitation period for occupational disease, for repetitive trauma injury or for accidental injury definitely located in time and place— applies to claims under § 7-433c. Of course, if the legislature disagrees with our conclusion concerning the applicability of the limitation period governing accidental injuries definitely located in time and place, it is perfectly free to clarify its intent in that regard.

We note that Justice Zarella, in his concurrence, contends that we should overrule our long-standing precedent interpreting § 7-433c as containing a notice requirement; see, e.g., *Collins* v. *West Haven*, 210 Conn. 423, 430, 555 A.2d 981 (1989); because (1) "nothing in . . . § 7-433c requires that notice of hypertension or heart disease be given to the municipal employer within a specified period of time in order for a claimant to receive compensation," and (2) "the notion that hypertension or heart disease is an 'accidental injury' is absurd and contrary to common medical knowledge . . . ." Although we might agree with Justice Zarella if we were writing on a clean slate, we are not. Indeed, neither party has claimed that we should overrule the prior precedent of this court with which Justice Zarella disagrees, and in the absence of such a request, fundamental fairness to the parties dictates that we not do so *sua sponte*. See, e.g., *Sabrowski* v. *Sabrowski*, 282 Conn. 556, 560, 923 A.2d 686 (2007) ("We long have held that, in the absence of a question relating to subject matter jurisdiction, [an] [a]ppellate [c]ourt may not reach out and decide a case before it on a basis that the parties never have raised or briefed. . . . To do otherwise would deprive the parties of an opportunity to present arguments regarding those issues." [Citations omitted.]). Even if a party had requested that we overrule that prior precedent, however, we disagree that § 7-433c is not reasonably susceptible of the interpretation that this court previously has adopted. As we previously indicated, General Statutes § 7-433c provides that compensation shall be provided thereunder "in the same amount and the same manner as that provided under [the Workers' Compensation Act] . . . ." In light of this language, it is not unreasonable to conclude that the legislature intended

tion to employment. See General Statutes § 31-275 (16) (A) (defining "personal injury" or "injury" to include "an injury to an employee that is causally connected with the employee's employment *and is the direct result of repetitive trauma or repetitive acts incident to such employment*" [emphasis added]). Because the plaintiff in the present case failed to present any evidence that his hypertension was causally connected to his employment, the board properly treated his claim as one for accidental injury definitely located in time and place.[13]

for § 7-433c to comply with the notice provisions of the Workers' Compensation Act. Finally, and perhaps most importantly, "our case law dictates that we should be especially wary of overturning a decision that involves the construction of a statute. . . . When we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do. Sometimes, when we have made such a determination, the legislature instructs us that we have misconstrued its intentions. We are bound by the instructions so provided. . . . More often, however, the legislature takes no further action to clarify its intentions. Time and again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute. . . . Once an appropriate interval to permit legislative reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision." (Internal quotation marks omitted.) *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 494–95, 923 A.2d 657 (2007). In view of the fact that this court first interpreted § 7-433c as requiring that a notice of claim be submitted in accordance with the provisions of General Statutes § 31-294 more than twenty years ago; see *Collins* v. *West Haven*, supra, 210 Conn. 430 ("Section 7-433c . . . directs claimants to the provisions of the Workers' Compensation Act . . . to determine how to proceed with a claim for compensation. Section 31-294 states that '[n]o proceedings for compensation . . . shall be maintained unless a written notice of claim for compensation is given within one year from the date of the accident . . . .' " [Citation omitted.]); we must presume that the legislature would have taken appropriate corrective action if it had disagreed with that interpretation.

[13] The plaintiff nevertheless contends that "[i]nherent" in our analysis in *Malchik* is "the recognition that application of the repetitive trauma analysis is appropriate in heart and hypertension claim[s]" brought pursuant to §§ 5-145a and 5-145c and, therefore, by extension, to claims brought pursuant to § 7-433c. We never have suggested, however, that a repetitive trauma

## II

In light of our conclusion that the board correctly determined that the one year limitation period of § 31-294c for an accidental injury definitely located in time and place applies to the plaintiff's claim under § 7-433c, we now must decide when that limitation period began to run. The plaintiff asserts that the board incorrectly concluded that he was required to bring his claim within one year from the date that he knew or should have known that he was suffering from "symptoms" of hypertension. The plaintiff contends, rather, that the board's interpretation of § 31-294c, as applied to claims under § 7-433c, is incompatible with the language and import of § 7-433c, and that the one year limitation period started to run on the date that his physician, Monaco, informed him that he had hypertension. The plaintiff further contends that the board's unduly restrictive interpretation of § 31-294c vests far too much discretion in the commissioner to determine when a claimant is deemed to have hypertension and that the approach that the board adopted has resulted in standardless decision making. According to the plaintiff, the board's construction also has resulted in an "overwhelming" number of claims under § 7-433c being dismissed as untimely,[14] which, the plaintiff asserts, has frustrated

theory of recovery necessarily is inapplicable to heart and hypertension claims. We simply have held that a claimant, in order to proceed under such a theory, is entitled to recover under the Workers' Compensation Act only upon establishing that his condition is *in fact* the result of repetitive trauma. See *Malchik* v. *Division of Criminal Justice*, supra, 266 Conn. 737–41. If, however, the claimant elects to proceed under § 7-433c—as the plaintiff in the present case has elected to proceed—the one year limitation period for an accidental injury definitely located in time and place applies.

[14] In several cases, the board upheld the dismissal of claims under § 7-433c as untimely because the claimant in each case failed to file a claim within one year of having a series of elevated blood pressure readings or other symptoms associated with hypertension even though the claimant's physician never diagnosed the claimant with or discussed hypertension, or there was at least a factual dispute about whether the claimant's physician informed the claimant that he had hypertension. See *Wabno* v. *Derby*, No. 5283 CRB-4-07-20 (September 12, 2008); *Thompson* v. *New Canaan*, No.

the remedial purpose of that provision.[15] Finally, the plaintiff contends that elevated blood pressure readings can be an indicator of any number of health problems or diseases, whereas hypertension is a diagnosis of a particular condition. The plaintiff maintains, therefore, that it is unreasonable to require an employee, who is not a medical professional, to file a notice of claim under § 7-433c merely because he or she has symptoms of hypertension. In the plaintiff's view, the only fair standard to apply is one that requires the filing of a notice of claim when an actual diagnosis of hypertension has been communicated to the employee by a medical professional. We agree with the plaintiff.

---

5228 CRB-7-07-5 (August 21, 2008); *McCarthy* v. *East Haven*, No. 5174 CRB-3-06-12 (May 30, 2008); *Brymer* v. *Clinton*, No. 5135 CRB-3-06-9 (April 23, 2008); *Roohr* v. *Cromwell*, No. 5122 CRB-8-06-8 (April 23, 2008); *Ciarlelli* v. *Hamden*, No. 5098 CRB-3-06-6 (April 1, 2008); *Balfore* v. *Windsor Locks*, No. 5024 CRB-1-05-11 (January 31, 2007); *Chernak* v. *Stamford*, No. 5012 CRB-7-05-10 (December 13, 2006); *Arborio* v. *Windham*, No. 5009 CRB-2-05-10 (October 4, 2006), rev'd sub nom. *Arborio* v. *Windham Police Dept.*, 103 Conn. App. 172, 928 A.2d 616 (2007); *Kaminski* v. *Naugatuck*, No. 4956 CRB-5-05-6 (June 28, 2006); *Peck* v. *Somers*, No. 4640 CRB-1-03-3 (March 5, 2004); *Pearce* v. *New Haven*, No. 4385 CRB-03-01-5 (March 28, 2002), aff'd, 76 Conn. App. 441, 819 A.2d 878, cert. denied, 264 Conn. 913, 826 A.2d 1155 (2003); but cf. *Hallock* v. *Westport*, No. 4829 CRB-4-04-7 (July 22, 2005) (one "borderline" blood pressure reading did not constitute evidence of hypertension so as to require claimant to file claim under § 7-433c within one year).

[15] It is true, of course, that the workers' compensation statutes are remedial in nature and, therefore, should be construed generously to accomplish their humanitarian purpose. E.g., *Pizzuto* v. *Commissioner of Mental Retardation*, 283 Conn. 257, 265, 927 A.2d 811 (2007). "Although an award of benefits under § 7-433c *is* a work[ers'] compensation award in the sense that its benefits are payable and procedurally administered under the Work[ers'] Compensation Act . . . [it] is *not* a work[ers'] compensation award because it requires no proof of eligibility or liability under the Work[ers'] Compensation Act." (Emphasis in original; internal quotation marks omitted.) *Bergeson* v. *New London*, 269 Conn. 763, 772, 850 A.2d 184 (2004). Nevertheless, even though an award under § 7-433c does not constitute an award under the Workers' Compensation Act, this court previously has characterized § 7-433c as remedial in nature. See, e.g., *Costello* v. *Fairfield*, 214 Conn. 189, 194, 571 A.2d 93 (1990); cf. *Szudora* v. *Fairfield*, supra, 214 Conn. 557–58.

The Workers' Compensation Act defines a personal injury or injury as one "that may be definitely located as to the time when and the place where the accident occurred . . . ." General Statutes § 31-275 (16) (A). We acknowledge that this standard presents certain challenges when applied to heart disease and related disabilities. See, e.g., *Discuillo* v. *Stone & Webster*, 242 Conn. 570, 580, 698 A.2d 873 (1997) ("[a]lthough the plaintiff's injury is localizable as to time and place . . . a stress-induced heart attack does not necessarily coincide with the everyday usage of the word 'accident' "). For the reasons set forth in part I of this opinion, however, we are constrained to apply the limitation period for accidental injury even though, as the plaintiff maintains, it reasonably may be argued that hypertension fits more readily within the conceptual framework of repetitive trauma. With respect to the determination of when the injury occurred in the context of heart disease claims, this court previously has identified a relatively discrete point in time at which the disability became manifest under the particular facts presented. See, e.g., *McDonough* v. *Connecticut Bank & Trust Co.*, 204 Conn. 104, 119, 527 A.2d 664 (1987) (plaintiff's heart disease constituted accidental injury that manifested over two day period due to unexpected stress at work); *Stier* v. *Derby*, 119 Conn. 44, 49–52, 174 A. 332 (1934) (police officer's death due to thrombosis or occlusion of coronary arteries, after excitement and unusual exertion while responding to accidental drowning, constituted accidental injury definitely located in time and place).

Although this court previously has not had occasion to consider how the date of injury is to be determined for purposes of ascertaining when the one year limitation period of § 31-294c begins to run on hypertension claims under § 7-433c, the Appellate Court has considered that issue in two recent cases, namely, *Pearce* v. *New Haven*, supra, 76 Conn. App. 441, and *Arborio*

v. *Windham Police Dept.*, supra, 103 Conn. App. 172. Because both *Pearce* and *Arborio* involve the very same issue raised by the present appeal, we now discuss them in some detail.

In *Pearce*, the plaintiff, Francis Pearce, began working for the New Haven fire department in 1978 after successfully passing a preemployment physical examination that revealed no evidence of hypertension. *Pearce* v. *New Haven*, supra, 76 Conn. App. 442. In August, 1988, he began seeing Mark Kasper, Pearce's family physician. Id. On August 16, 1988, Pearce's blood pressure was recorded three times, with readings of 180/94, 178/104 and 156/94. Id. At that time, Kasper informed Pearce that he had elevated blood pressure. Id.

For the next two years, Pearce saw Kasper on a regular basis. Id. At nearly every visit, Pearce registered elevated blood pressure readings, and Kasper discussed those readings with Pearce. Id. Kasper advised Pearce to make certain lifestyle changes and to monitor his blood pressure at home. Id. In 1990, Pearce stopped seeing Kasper and did not return for eight years. Id., 443. During that intervening period, in 1993, Pearce registered a blood pressure reading of 172/100. Id. In 1995, Kasper wrote a letter to Pearce asking him to return to his office because he was concerned about his blood pressure. Id. On October 15, 1998, Pearce formally was diagnosed with hypertension and was prescribed antihypertensive medication. Id. Shortly thereafter, he filed a notice of claim for hypertension benefits under § 7-433c, claiming a date of injury of October 15, 1998. Id. After a formal hearing, the workers' compensation commissioner for the third district dismissed the claim as untimely because Pearce had not filed his claim within one year of the multiple, elevated blood pressure readings that he had registered between 1988 and 1990. See id., 444, 446.

Pearce appealed from the decision of the commis-
sioner to the board, which affirmed the commissioner's
decision. Id., 444. The board framed the issue before it
as requiring a determination of whether Pearce's "high
blood pressure readings in 1988, 1989 and 1990 consti-
tute[d] an injury under § 31-294c (a) that obligated [him]
to file a [claim] at that time, rather than a decade later
. . . ." *Pearce* v. *New Haven*, No. 4385 CRB-03-01-5
(March 28, 2002). In answering that question in the
affirmative, the board declared that, "upon developing
symptoms of hypertension, [Pearce] was required to
notify his employer of a compensation claim within one
year of the date those symptoms [became] manifest." Id.

Pearce then appealed to the Appellate Court, which
affirmed the board's decision. *Pearce* v. *New Haven*,
supra, 76 Conn. App. 450. In so doing, the Appellate
Court observed that the purpose of § 31-294c "is to
inform the employer of [the] possibility of a claim for
benefits being filed at a later time. . . . The employee
need not be disabled at the time he or she files a notice
that symptoms are being experienced related to hyper-
tension or heart disease; the notice is required to alert
the employer to a potential claim." (Citation omitted.)
Id., 449. The Appellate Court then concluded that
"[Pearce had] failed to file a notice of injury or claim
until 1998, despite having been repeatedly informed by
his physician that his blood pressure readings, during
1988, 1989 and 1990, were elevated. Accordingly, the
commissioner's conclusion that the . . . claim for ben-
efits was untimely reflect[ed] a proper application of
the law to the facts of [the] case." Id., 450.

After *Pearce*, the board consistently applied the
Appellate Court's holding in that case for two proposi-
tions: (1) "[a] claimant with hypertensive symptoms is
required to file a notice of claim when he is told [that]
he has high blood pressure readings, even if he has not
been placed on medication, lost time from work or

become disabled"; *Peck* v. *Somers*, No. 4640 CRB-1-03-3 (March 5, 2004); see also id. ("the claimant's knowledge of high blood pressure readings is crucial to the determination of whether the [employer] was put on timely notice of the claim for benefits"); and (2) the commissioner has considerable discretion to determine when an injury has occurred for purposes of deciding whether a claim is timely. See, e.g., *Brymer* v. *Clinton*, No. 5135 CRB-3-06-9 (April 23, 2008) ("[t]he essential question . . . is whether the trier had sufficient evidence to find that the claimant suffered from hypertension [about three years before his primary care physician diagnosed him with the condition], triggering his duty to file a claim"); *Kaminski* v. *Naugatuck*, No. 4956 CRB-5-05-6 (June 28, 2006) ("In [the] board's decision in *Pearce*, [the board] explicitly stressed that the trier of fact had discretion to decide whether high blood pressure readings constituted evidence of hypertension. . . . In affirming [the board's] decision, the Appellate Court expressed no disagreement with [the board's] line of reasoning. . . . The established standard [therefore] is that the time of onset of a claimant's hypertension symptoms presents a factual question, as does whether a given blood pressure reading constitutes a manifestation of that hypertension." [Citations omitted.]).

Thereafter, however, in *Arborio*, the Appellate Court implicitly called into question the continued viability of the standard that the board had applied in *Pearce*. In *Arborio*, the Appellate Court reversed the board's decision upholding the dismissal of a claim for benefits under § 7-433c as untimely notwithstanding the finding of the commissioner that the plaintiff, Rick E. Arborio, had not filed a notice of claim within one year of the date that he became aware that he had symptoms of hypertension. *Arborio* v. *Windham Police Dept.*, supra, 103 Conn. App. 183–88. The Appellate Court concluded

that, although the record supported the commissioner's findings that Arborio knew of his elevated blood pressure readings and had been advised by his physician to monitor his blood pressure at home more than one year before he filed his claim; id., 183, 186; such findings did not support the legal conclusion that Arborio had suffered an injury within the meaning of § 31-294c. See id., 187–88.

The facts of *Arborio*, which are very similar to the facts of the present case, are set forth in the opinion of the Appellate Court. "After passing a preemployment physical examination that disclosed no signs of hypertension or heart disease, [Arborio] began his employment with the . . . Windham police department on July 27, 1987. [Arborio] had an office visit with Edward S. Sawicki, his treating physician, on December 23, 1997, at which he had a blood pressure reading of [150/86], which Sawicki indicated was not alarming. When [Arborio] next visited Sawicki on April 17, 2000, his blood pressure readings were [146/90] and [140/94], and Sawicki noted the words 'labile hypertension' on [Arborio's] chart. During a deposition related to [the] case, Sawicki testified that at the time of the April 17, 2000 office visit, [Arborio] was age fifty-one, two blood pressure checks done in the office had been 'above 90,' [Arborio's] cholesterol was high in 1998 and, because of the increasing risk to his health, consideration was given to the 'potential need to address the blood pressure readings with medication, and [Arborio] was told to obtain a blood pressure monitor to check his blood pressure at home.' On May 17, 2001, [Arborio] had a blood pressure reading of [140/100] at another office visit with Sawicki, who made another chart notation of 'labile hypertension' and also noted that [Arborio] had an outside reading of [130/90]. Sawicki, at [that] time, became more serious about the possibility of having to treat [Arborio's] blood pressure. Sawicki ordered

a stress test and requested that [Arborio] monitor his blood pressure at home and report back to him in a few weeks. The stress test showed that [Arborio] had a 'hypertensive response.' Sawicki began to monitor [Arborio's] blood pressure more closely . . . . On January 23, 2003, Sawicki placed [Arborio] on medication to control his blood pressure [and, on April 21, 2003, Arborio filed notice of a claim under § 7-433c]." Id., 182–84.

Thereafter, Arborio's employer, the Windham police department, sought to have Arborio's claim dismissed as untimely. On the basis of the foregoing facts, the commissioner dismissed the claim, finding in relevant part as follows: "As a result of the office visits of April 17, 2000, and May 17, 2001, which resulted in the scheduling of a stress test, [Arborio] was aware [that] he had elevated blood pressure and that he had a potential hypertension problem that may require medication. . . . [Arborio] did not file a notice of injury until April 21, 2003, despite having been informed by his physician that he had elevated blood pressure readings and had a potential problem [that could] require medication to control. . . . [Arborio's] claim for benefits pursuant to § 7-433c . . . [was] untimely, and the workers' compensation commission lack[ed] subject matter jurisdiction to consider [it]." (Internal quotation marks omitted.) Id., 184.

After the board upheld the dismissal of Arborio's claim, Arborio appealed to the Appellate Court, which reversed the board's decision on the ground that the commissioner's factual findings, although supported by the record, did not support the legal conclusion that Arborio's claim was untimely. Id., 187–88. The Appellate Court, however, first addressed Arborio's contention that *Pearce* improperly had changed the law governing heart disease and hypertension claims by requiring employees to file a notice of claim before their hyperten-

sion became disabling. Id., 176. The Appellate Court rejected that contention, stating that, "[c]ertainly, proof of a disability is a prerequisite to the actual collection of benefits, but one need not be disabled before being required to notify one's employer of an accidental injury and to file a claim within one year of that injury." Id., 177. After underscoring the fact that a claimant may be required to notify his employer that he suffers from hypertension even though the condition had not yet ripened into a partial or total disability, the Appellate Court further stated: "When an employee sustains an accidental injury, defined in § 31-275 (16) as one that may be definitely located as to the time when and the place where the accident occurred, he immediately must notify his employer of the accident pursuant to § 31-294b. If an employee fails to provide immediate notification, his award of benefits may be reduced if the employer can prove that it has been prejudiced by the failure to provide immediate notification. General Statutes § 31-294b. However, pursuant to § 31-294c (a), the employee not only must notify his employer of the accident, but he also must file a claim for benefits within one year of the date of the accident. Failure to file such a claim results in a jurisdictional bar, unless the failure to file a claim within one year of the date of the accident is saved pursuant to one of the provisions found in § 31-294c (c). See *Kuehl* v. *Z-Loda Systems Engineering* [*Inc.*], 265 Conn. 525, 534, 829 A.2d 818 (2003) ([i]t is well established, moreover, that a notice of claim or the satisfaction of one of the . . . exceptions [contained in § 31-294c (c)] is a prerequisite that conditions whether the commission[er] has subject matter jurisdiction under the [Workers' Compensation Act] . . . .)."[16]

---

[16] The Appellate Court also defended *Pearce* against Arborio's claim that *Pearce* had "confused occupational disease and repetitive trauma-accidental injury by requiring a repetitive trauma-accidental injury claimant to file a claim for benefits at the first manifestation of a symptom of high blood pressure." (Internal quotation marks omitted.) *Arborio* v. *Windham Police Dept.*, supra, 103 Conn. App. 175. The Appellate Court explained that the

(Internal quotation marks omitted.) *Arborio* v. *Windham Police Dept.*, supra, 103 Conn. App. 178–79.

The Appellate Court then turned to Arborio's contention that his claim improperly had been dismissed as untimely. The Appellate Court agreed with Arborio and explained: "Two office visits showing high blood pressure readings, a stress test and an employee's awareness of those elevated readings and awareness that 'he had a potential hypertension problem that may require medication' simply are not sufficient to support the conclusion that [the employee] had an accidental injury that required him to notify his employer and to file a claim for benefits. The commissioner did not find that [Arborio] had hypertension but only that he had a potential hypertension problem. When an employee has an accidental injury, he is obligated to notify his employer and to file a claim for benefits within one year of that accidental injury. See General Statutes §§ 31-294b and 31-294c. This is true even when the employee is not seeking immediate benefits but simply is seeking to preserve his right to future benefits. . . . The employee, however, must have had some type of accidental injury (not necessarily an immediately disabling injury) before being required to file a claim. . . .

workers' compensation commissioner in *Pearce* had treated Pearce's hypertension as an accidental injury definitely located in time and place, not a repetitive trauma injury. Id. The Appellate Court further explained: "We did not hold, nor did the commissioner or board hold, that [Pearce] had a duty to notify his employer at the first 'manifestation of a symptom.' [Pearce] . . . repeatedly had been told, over a three year period, that his blood pressure was elevated, and, rather than address the issue, he chose to stop seeing his physician for the next eight years. Although [Pearce] had not been placed on medication for hypertension, [the Appellate Court] agreed with the commissioner's finding that [he] knew of his hypertensive status during that three year period when he repeatedly had been counseled by his physician." Id., 175–76. Thus, the Appellate Court apparently concluded that Pearce's physician had informed him of his *hypertensive status*, not merely of his hypertensive symptoms, years before he filed a notice of claim. See id.

[T]he mere awareness of some 'potential problem' that might, one day, require medication simply cannot be enough to trigger the notice of claim provision." (Citations omitted.) *Arborio* v. *Windham Police Dept.*, supra, 103 Conn. App. 187–88.

In both *Pearce* and *Arborio*, the board applied a standard that essentially authorizes workers' compensation commissioners to accept a post hoc diagnosis of hypertension based on a claimant's symptoms and then impute knowledge of that diagnosis retroactively to the claimant. We believe that such a standard is inconsistent with the meaning of accidental injury and our case law applying that principle, which "requires proof of an accidental injury *which can be definitely located both as to time and place.*" (Emphasis added.) *Stier* v. *Derby*, supra, 119 Conn. 49. Indeed, in the present case, Monaco, the plaintiff's physician, deemed the plaintiff's blood pressure readings prior to May, 2004, to be too inconsistent to render a definitive diagnosis of hypertension. The evidence presented to the commissioner also established that, prior to 2004, the majority of the plaintiff's blood pressure readings were either normal or borderline hypertensive. The commissioner concluded, nevertheless, on the basis of the testimony of Krauthamer, the defendant's expert witness, that the plaintiff's claim was untimely because the plaintiff's medical records revealed "documented, elevated hypertensive blood pressure readings in 2000, 2001, 2002 and 2003." Neither the commissioner nor Krauthamer, however, identified a date of injury, that is, a relatively discrete point in time at which the plaintiff's hypertension actually became manifest.

It is noteworthy that the board, in several of its earlier decisions, had concluded that the limitation period of § 31-294c begins to run on hypertension claims under § 7-433c only when the claimant's hypertension becomes disabling, which, as we previously indicated,

has been defined by the need for medical treatment and prescription medicine. See, e.g., *Riccitelli* v. *New Haven*, 15 Conn. Workers' Comp. Rev. Op. 138, 140 (1996) (limitation period for claim under § 7-433c began to run on date that claimant commenced taking prescription medication for hypertension), aff'd, 44 Conn. App. 903, 688 A.2d 367 (1997); see also *Fortin* v. *Naugatuck*, 14 Conn. Workers' Comp. Rev. Op. 48, 48–49 (1995). Significantly, these events coincide with the employer's obligation to pay benefits. See General Statutes § 31-294d (a) (1) ("[t]he employer, as soon as the employer has knowledge of an injury, shall provide a competent physician or surgeon to attend the injured employee and, in addition, shall furnish any medical and surgical aid or hospital and nursing service, including medical rehabilitation services and prescription drugs, as the physician or surgeon deems reasonable or necessary"). Although the board subsequently departed from that standard in favor of one that imputes knowledge of a diagnosis of hypertension to claimants on the basis of their awareness of elevated blood pressure readings, the reasoning for doing so lacks persuasive force.[17]

[17] Indeed, in *Pearce*, the board affirmed the decision of the workers' compensation commissioner for the third district even though, as the board explained, the commissioner had applied an incorrect legal standard in concluding that Pearce's claim was untimely. *Pearce* v. *New Haven*, supra, No. 4385 CRB-03-01-5. Specifically, the board explained that, in determining whether Pearce had satisfied the jurisdictional requirements of § 31-294c, the commissioner mistakenly had applied the standard pertaining to a commissioner's determination of whether a preemployment physical examination has revealed "any evidence" of heart disease or hypertension. As we previously indicated, and as the board explained in *Leary* v. *Stamford*, No. 3280 CRB-7-96-3 (September 17, 1997), "[§] 7-433c allows uniformed members of municipal fire and police departments who suffer health impairments due to hypertension or heart disease to collect compensation identical to that provided by [the Workers' Compensation Act], provided that upon entry into service, they have passed a physical examination that failed to reveal any evidence of hypertension or heart disease. The meaning of [§ 7-433c] is clear and unambiguous. . . . [T]he physical examination must reveal no evidence of hypertension or heart disease in order for the claimant to be eligible for the application of § 7-433c. . . . A claimant not only has to pass a pre-employment physical to invoke this [so-called] bonus compen-

Because General Statutes § 7-433c (a) provides for an award of benefits to an otherwise eligible claimant who "suffers . . . any condition or impairment of health caused by hypertension or heart disease resulting

sation statute, [but] the exam also must reveal no evidence of hypertension or heart disease. . . .

"The determination of whether a physical examination revealed any evidence of hypertension or heart disease is a factual issue committed to the trier's sound discretion." (Citations omitted; internal quotation marks omitted.) In *Pearce*, however, the commissioner applied the standard discussed in *Leary* as the standard for determining when the limitation period had begun to run on Pearce's claim. See *Pearce v. New Haven*, supra, No. 4385 CRB-03-01-5. Thus, the commissioner in *Pearce* examined Pearce's medical record for "any evidence of hypertension"; (internal quotation marks omitted) id.; and concluded that Pearce's earliest, elevated blood pressure readings between 1988 and 1990 constituted such evidence, thus triggering the commencement of the limitation period on his claim under § 7-433c.

Notwithstanding the commissioner's error, the board affirmed the commissioner's dismissal of Pearce's claim as untimely, thereby placing its imprimatur on the commissioner's conclusion that the determination of when a claimant's hypertension constitutes an injury, like the determination of whether a preemployment examination had revealed any evidence of hypertension, is a factual question committed to the broad discretion of the fact finder. In support of its conclusion, the board in *Pearce* cited *Elumba v. Stamford*, No. 4084 CRB-7-99-07 (August 10, 2000), and *Zalot v. Bristol*, No. 4256 CRB-6-00-6 (March 16, 2001). In each of those cases, however, as the board in *Pearce* noted, the workers' compensation commissioner had refused to dismiss a hypertension claim under § 7-433c in light of § 31-294c even though the claimant's medical file indicated that he previously had been prescribed antihypertensive medication more than one year before the filing of a notice of claim. In declining to dismiss the claims, the commissioner in each case had found that previous, isolated elevated blood pressure readings in combination with numerous normal readings did not indicate that the claimant was suffering from hypertension. See *Zalot v. Bristol*, supra, No. 4256 CRB-6-00-6; *Elumba v. Stamford*, supra, No. 4084 CRB-7-99-07; see also *Pearce v. New Haven*, supra, No. 4385 CRB-03-01-5. The board in *Pearce* reasoned, nevertheless, that, if the workers' compensation commissioners in *Elumba* and *Zalot* had discretion to *ignore* the fact that the physicians in those cases previously had prescribed the claimants antihypertensive medication in finding that their claims fell within the one year limitation period applicable to § 7-433c, then, logically, the commissioner in *Pearce* had discretion to ignore the fact that Pearce previously had *not* been diagnosed with hypertension in determining when that limitation period began to run on *his* claim. *Pearce v. New Haven*, supra, No. 4385 CRB-03-01-5.

in his death or his . . . disability," it stands to reason that a formal diagnosis of hypertension or heart disease, communicated to an employee by his or her physician, constitutes the "injury" that triggers the running of the limitation period of § 31-294c. Indeed, under § 7-433c, a claimant may recover benefits for hypertension only if he suffers from that condition; a claimant is not entitled to benefits merely because he exhibits symptoms consistent with hypertension, such as elevated blood pressure, from time to time. Furthermore, requiring that an employee file a notice of claim for hypertension benefits only after he has been informed by a medical professional that he is suffering from that condition, and not merely from its symptoms, is consistent with the principle that, as a remedial statute; see *Costello* v. *Fairfield*, 214 Conn. 189, 194, 571 A.2d 93 (1990); § 7-433c must be liberally construed in favor of the claimant.

We also agree with the plaintiff that the standard presently applied by the board places the intended beneficiaries of § 7-433c in the untenable position of having to diagnose themselves with hypertension, on the basis of their symptoms, or having to run the risk of losing benefits under that statute. Periodic, elevated blood pressure readings "may or may not be indicative of hypertension, depending on the circumstances." (Internal quotation marks omitted.) *Arborio* v. *Windham Police Dept.*, supra, 103 Conn. App. 187. Indeed, in the present case, the plaintiff's two highest blood pressure readings were recorded when he was sprayed with pepper spray at work and when he discovered a lump in his groin. Thus, this court's recent observation concerning a claim for benefits for an occupational disease applies with equal force in the present case: "Most symptoms of disease are not peculiar to one disease alone and their recognition is [a] matter largely within the field of expert medical knowledge; when an

employee, feeling ill, visits a physician, the physician may find clearly present a symptom of some . . . disease [or condition, such as hypertension], but he may find other symptoms present suggesting the possibility of some other disease [or condition] and, until he is more certain, he may well deem it advisable not to inform the employee of the indication of the . . . disease [or condition] he has found." (Internal quotation marks omitted.) *Ricigliano* v. *Ideal Forging Corp.*, 280 Conn. 723, 735, 912 A.2d 462 (2006). This is especially true of hypertension, which often is diagnosed after observing the patient over a period of time. See National Heart, Lung, and Blood Institute, National Institutes of Health, "How Is High Blood Pressure Diagnosed?," available at http://www.nhlbi.nih.gov/health/dci/Diseases/Hbp/HBP_Diagnosis.html (last visited December 6, 2010) (Physicians usually "diagnose high blood pressure . . . using the results of blood pressure tests. These tests will be done several times to make sure the results are correct. If [the] numbers are high, [the] doctor may have [the patient] return for more tests to check [the patient's] blood pressure over time. If [the patient's] blood pressure is 140/90 . . . or higher over time, [the] doctor will likely diagnose [him or her] with [high blood pressure]."). Because a diagnosis of hypertension involves the sound exercise of medical judgment, it is particularly inappropriate to expect a patient to discern that he or she suffers from that condition in the absence of a diagnosis by a professional with the requisite medical training and expertise.

In light of the foregoing, we conclude that the one year limitation period for claims under § 7-433c begins to run only when an employee is informed by a medical professional that he or she has been diagnosed with hypertension. In many respects, this simply represents a return to the standard that the board applied prior to *Pearce*, which, in our view, more faithfully adhered to

the statutory definition of accidental injury in view of the fact that, as a general matter, a formal diagnosis of hypertension can be definitely located in time and place. Thus, although the issue of when the limitation period of § 31-294c begins to run in any given case remains a question of fact for a workers' compensation commissioner, evidence that an employee merely knew of past elevated blood pressure readings, or was advised by his or her physician to make certain lifestyle changes in response thereto, is not sufficient to trigger the limitation period in the absence of evidence that the employee formally had been diagnosed with hypertension by a medical professional and advised of that diagnosis.[18]

The decision of the compensation review board is reversed and the case is remanded with direction to reverse the decision of the commissioner and to remand the case to the commissioner for further proceedings according to law.

In this opinion ROGERS, C. J., and NORCOTT and KATZ, Js., concurred.

ZARELLA, J., concurring. I agree with the result reached by the majority. I write separately, however, because, in my view, nothing in General Statutes § 7-433c[1] requires that notice of hypertension or heart disease be given to a municipal employer within a specified period of time in order for a claimant to receive compensation. I am aware that our precedent has repeatedly

---

[18] Of course, this standard is not so inflexible as to require a finding in all cases that the medical professional used the term "hypertension" in communicating the diagnosis to the employee. For example, evidence that an employee was prescribed antihypertensive medication for the treatment of high blood pressure related to hypertension, and not some other illness, likely would support a finding that the employee formally had been diagnosed with hypertension and knew, or should have known, of that diagnosis.

[1] See footnote 2 of the majority opinion for the full text of the relevant portions of § 7-433c.

interpreted § 7-433c to require claimants to comply with the notice provisions relating to accidental injuries contained in the Workers' Compensation Act (act), General Statutes § 31-294c (a);[2] see, e.g., *Collins* v. *West Haven*, 210 Conn. 423, 430, 555 A.2d 981 (1989); and, as a result, our case law has been preoccupied with the quixotic exercise of attempting to determine "the time when and the place where" the hypertension or heart disease at issue occurred.[3] See, e.g., *Arborio* v. *Windham Police Dept.*, 103 Conn. App. 172, 187, 928 A.2d 616 (2007) (concluding that "[t]wo office visits showing high blood pressure readings, a stress test and an employee's awareness of those elevated readings and awareness that 'he had a potential hypertension problem that may require medication' simply are not sufficient to support the conclusion that the plaintiff had an accidental injury [of hypertension] that required him to notify his employer and to file a claim of benefits"); *Pearce* v. *New Haven*, 76 Conn. App. 441, 450, 819 A.2d 878 (concluding that plaintiff's injury of hypertension occurred sometime between 1988 and 1990, because plaintiff had been repeatedly advised by his physician of high blood pressure readings during that time period), cert. denied, 264 Conn. 913, 826 A.2d 1155 (2003). Because I conclude that our previous interpretations of § 7-433c are clearly wrong, in that applying the notice requirements of § 31-294c (a) violates the express terms of § 7-433c, and

[2] General Statutes § 31-294c (a) provides in relevant part: "No proceedings for compensation under the provisions of this chapter shall be maintained unless a written notice of claim for compensation is given within one year from the date of the accident . . . which caused the personal injury . . . . Notice of a claim for compensation may be given to the employer or any commissioner and shall state, in simple language, the date and place of the accident and the nature of the injury resulting from the accident . . . and the name and address of the employee and of the person in whose interest compensation is claimed. . . ."

[3] Pursuant to General Statutes § 31-275 (16) (A), an accidental injury is an "injury that may be definitely located as to the time when and the place where the accident occurred . . . ."

that the notion that hypertension or heart disease is an "accidental injury" is absurd and contrary to common medical knowledge because such conditions are not definitively determinable as to time and place, I would overrule our prior decisions in this area.

Section 7-433c (a) provides in relevant part: "Notwithstanding any provision of chapter 568 or any other general statute, charter, special act or ordinance to the contrary, in the event a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment . . . ."

In my view, the plain meaning of § 7-433c *unequivocally* directs municipal employers to pay compensation and to provide medical care to qualified claimants *whenever* such claimants suffer "any condition or impairment of health caused by hypertension or heart disease resulting in . . . death or . . . temporary or permanent, total or partial disability . . . ." Indeed, we have previously stated that "[t]he mere fact that a fireman or policeman has hypertension or heart disease and dies or is disabled as a result thereof qualifies him or his dependents for benefits under this section." *Plainville* v. *Travelers Indemnity Co.*, 178 Conn. 664,

670, 425 A.2d 131 (1979). Nothing in § 7-433c requires claimants to comply with the notice requirements of chapter 568 in order to receive compensation. In fact, quite the opposite is true. In chapter 568, which contains the act, the legislature defined " '[p]ersonal injury' " to include accidental injuries, repetitive trauma, and occupational diseases. General Statutes § 31-275 (16) (A). The purpose of distinguishing between these different types of personal injury is to allow for different notice provisions depending on the type of personal injury or disability suffered by the employee. See General Statutes § 31-294c; *Malchik* v. *Division of Criminal Justice*, 266 Conn. 728, 744, 835 A.2d 940 (2003) (claims for injuries resulting from repetitive trauma subject to same one year limitation period as claims for accidental injuries). In § 7-433c, however, the legislature used the term "personal injury," without describing the injury as an accidental injury, repetitive trauma or occupational disease, which strongly suggests that the legislature never was contemplating any notice requirement for personal injuries under § 7-433c. In other words, if the legislature were contemplating a notice requirement for § 7-433c injuries, they would have designated the particular category of personal injury that would have then controlled the appropriate time limitations for the notice. In addition, I conclude that the legislature's use of the phrase "[n]otwithstanding any provision of chapter 568 . . . to the contrary" also clearly evidences that the legislature intended that the notice requirements of chapter 568 and any other statutory impediments to recovery not apply to claims under § 7-433c. Thus, to be clear, the *only* provisions of chapter 568 that are incorporated into § 7-433c are those related to payment schedules and methods of payment for personal injuries. This interpretation is consistent with our case law that has deemed the compensation payable under § 7-

433c an " 'outright bonus' . . . ." *O'Connor* v. *Waterbury,* 286 Conn. 732, 752, 945 A.2d 936 (2008).

It appears that our case law in this area was first led astray in *Janco* v. *Fairfield,* 39 Conn. Sup. 403, 404–405, 466 A.2d 1 (1983), in which the plaintiff police officer filed a notice of claim with the workers' compensation commissioner (commissioner) for benefits under § 7-433c nearly three years after he became disabled due to heart disease. After a hearing, the commissioner awarded the plaintiff compensation. Id., 405. The town of Fairfield appealed to the compensation review board which affirmed the award. Id. The town then appealed the board's decision to the Appellate Session of the Superior Court claiming that the plaintiff was barred from recovering benefits under § 7-433c because he did not comply with the notice provisions contained in General Statutes § 31-294, which is now codified at § 31-294c. Id. The plaintiff responded that although § 7-433c provides that municipal employers must pay eligible firemen and policemen " 'compensation and medical care in the same amount and *the same manner as that provided under* [the act],' " the term "manner," as used in that statute, modifies "compensation and medical care" and, therefore, "refers solely to the types of benefits applicable to a given claim and the method of payment." (Emphasis in original.) Id. Accordingly, the plaintiff claimed that entitlement to compensation under § 7-433c was not conditioned on compliance with the notice requirements of the act. The court disagreed and concluded that the reference to chapter 568 contained in § 7-433c required that claims brought pursuant to § 7-433c comply with the procedural mandates of the act, including the notice provisions contained in § 31-294. Id., 405–406.

In my view, the court in *Janco* misinterpreted § 7-433c. I agree with the plaintiff in that case that the term "same manner," as used in § 7-433c, modifies "compen-

sation and medical care" and, therefore, refers solely to the types of benefits applicable to a given claim and the method of payment. In addition, I note that the commissioner and the compensation review board in *Janco* also must have agreed with this interpretation in light of the fact that they ruled in favor of the plaintiff. Finally, I conclude that the interpretation adopted by the court in *Janco* is further flawed in that it gives no meaning to the statute's introductory phrase, "[n]otwithstanding any provision of chapter 568 . . . to the contrary . . . ." General Statutes § 7-433c (a); see, e.g., *American Promotional Events, Inc.* v. *Blumenthal*, 285 Conn. 192, 203, 937 A.2d 1184 (2008) ("[i]nterpreting a statute to render some of its language superfluous violates cardinal principles of statutory interpretation").[4]

---

[4] The majority misconstrues § 7-433c in the same manner as the court in *Janco* did. According to the majority, it is not unreasonable to conclude that the legislature intended for § 7-433c to comply with the act's notice provisions on the basis of language in the statute mandating that compensation shall be paid "in the same amount and the same manner as that provided under [the act] . . . ." I disagree for several reasons.

First, as set forth in this concurring opinion, there is no express directive in § 7-433c requiring claimants to comply with the notice provisions under the act. Rather, the legislature has provided that claims for compensation under § 7-433c (a) shall be paid "[n]otwithstanding any provision of chapter 568 . . . to the contrary . . . ."

Second, "when a statute includes no express statute of limitations, [this court] should not simply assume that there is no limitation period. Instead, we borrow the most suitable statute of limitations on the basis of the nature of the cause of action or of the right sued upon." *Bellemare* v. *Wachovia Mortgage Corp.*, 284 Conn. 193, 199, 931 A.2d 916 (2007); see also 51 Am. Jur. 2d 533, Limitation of Actions § 129 (2000) ("When a statute includes no express statute of limitations, the court does not assume that there are no time limits; instead, it borrows the most suitable statute or other rule of timeliness . . . . The nature of the cause of action or of the right sued upon is the test by which to determine which statute of limitations applies and whether the action is barred by the running of the limitation period. Thus, for an action under a state statute that lacks an express limitations period, the courts look to analogous causes of action for which express limitations periods are available, either by statute or by case law."). This means that claims under § 7-433c are subject to a statute of limitations determined by reference to other provisions for disability benefits under title 7 of the General Statutes, such as General Statutes § 7-432, which

I recognize that the rule in *Janco* has been the law in this state for twenty-seven years and that "[t]his court has repeatedly acknowledged the significance of stare decisis to our system of jurisprudence because it gives stability and continuity to our case law." *Conway* v. *Wilton*, 238 Conn. 653, 658, 680 A.2d 242 (1996). Nevertheless, "this court also has concluded that, [t]he value of adhering to precedent is not an end in and of itself . . . ." (Internal quotation marks omitted.) *State* v. *Miranda*, 274 Conn. 727, 734, 878 A.2d 1118 (2005); see also *Conway* v. *Wilton*, supra, 660 ("[s]tare decisis is not an inexorable command" [internal quotation marks omitted]). "It is more important that the court should be right upon later and more elaborate consideration of the cases than consistent with previous declarations." *Barden* v. *Northern Pacific Railroad Co.*, 154 U.S. 288, 322, 14 S. Ct. 1030, 38 L. Ed. 934 (1894). "[T]here is a well recognized exception to stare decisis under which a court will examine and overrule a prior decision that is clearly wrong." *White* v. *Burns*, 213 Conn. 307, 335, 567 A.2d 1195 (1990). "In short, consistency must not be the only reason for deciding a case in a particular way, if to do so would be unjust. Consistency obtains its value best when it promotes a just decision." *Conway* v. *Wilton*, supra, 662.

provides that a claim for a retirement allowance due to a disability must be filed within one year after the disability is incurred.

Finally, it is unclear why the majority thinks that the legislature intended to place claims under § 7-433c on the same footing as claims under the act in light of this court's repeated statements that "an award of benefits under § 7-433c is *not* a workers' compensation award . . . ." (Emphasis added.) *Genesky* v. *East Lyme*, 275 Conn. 246, 252 n.9, 881 A.2d 114 (2005). Indeed, the benefits at issue are not included in the act, but, rather, are contained in part II of title 7 of the General Statutes, which concerns the retirement benefits of municipal employees. Accordingly, there is no reason for this court to assume that the legislature intended to place claims brought pursuant to § 7-433c on equal footing with claims brought pursuant to the act because, had the legislature intended to do so, it would have included such benefits expressly within the act. See *Dept. of Public Safety* v. *Freedom of Information Commission*, 298 Conn. 703, 729, 6 A.3d 763 (2010) (legislature knows how to convey its intent expressly).

After careful consideration of *Janco* and its progeny; see, e.g., *Collins* v. *West Haven*, supra, 210 Conn. 430; I have become convinced that the holding in *Janco*, that claims brought pursuant to § 7-433c must comply with the notice provisions contained in § 31-294c, was clearly wrong and, therefore, should be overruled.