******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

TIMOTHY CONROY *v.* CITY OF STAMFORD ET AL.
(AC 37474)

Beach, Keller and West, Js.

*Argued October 26—officially released December 15, 2015*

(Appeal from the Workers' Compensation Review
Board.)

*Brenda C. D. Lewis*, for the appellants (defendants).

*David J. Morrissey*, for the appellee (plaintiff).

*Opinion*

KELLER, J. The defendant city of Stamford[1] appeals from the decision of the Compensation Review Board (board) affirming the decision of the Workers' Compensation Commissioner for the Seventh District (trial commissioner) awarding benefits to the plaintiff, Timothy Conroy, for his hypertension in accordance with General Statutes §§ 7-433c and 31-294c (a). On appeal, the defendant claims that the board's decision to affirm the trial commissioner's finding and award should be reversed because the trial commissioner's findings and resulting conclusion that the plaintiff filed a claim for § 7-433c benefits in a timely fashion either resulted from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from the subordinate facts.[2] The plaintiff contests the defendant's claims by arguing that the board's decision should be upheld because it correctly affirmed the trial commissioner's decision insofar as the trial commissioner's findings and conclusion that the plaintiff filed his claim for hypertension benefits in a timely manner pursuant to §§ 7-433c and 31-294c (a) neither resulted from a misapplication of the law nor an unreasonable or illegal inference drawn from the subordinate facts. We agree with the plaintiff and affirm the board's decision.

The following facts, which were found by the trial commissioner and set forth in the board's opinion, as well as the procedural history underlying this appeal, are relevant to our review. "The [plaintiff] testified that he was hired by the [defendant] municipality's fire department as an entry-level firefighter in 1979 after undergoing a physical examination. As of the date of the formal hearing, the [plaintiff] was employed as the department's Deputy Fire Chief. The [plaintiff] held an [emergency medical technician (EMT)] certificate when he was hired by the fire department in 1979 because of his prior training as a physical education teacher; as of the date of the formal hearing, he had again been certified for three years.

"The [plaintiff] testified that the fire department would conduct annual physicals in a 'military induction type process' whereby a bus would show up with a doctor and a few nurses. Eventually, Concentra took over this activity and required the firefighters to fill out an extensive questionnaire regarding any physical problems. Prior to 2012, the [plaintiff] did not indicate on any questionnaires that he suffered from hypertension or high blood pressure; moreover, no doctor ever informed the [plaintiff] that he had high blood pressure or hypertension during the annual physicals. Joel M. Blumberg, M.D., was the [plaintiff's] primary care physician from 1973 until 2010, when Blumberg opened a concierge practice and the [plaintiff] changed his primary care provider. None of the [plaintiff's] subsequent

primary care providers ever expressed any concern about heart or hypertension issues.

"The [plaintiff] testified that prior to January 30, 2008, he could recall only one occasion when he had an elevated blood pressure reading; the [plaintiff] had consumed four or five cups of coffee during the course of fighting a fire and was up all night after sustaining a fall at the fire." The board noted that "[a]lthough the [plaintiff] could not remember the exact date of the fire, he testified that he consulted with a doctor at Concentra the morning after the fall and was advised to follow up with his own physician regarding his elevated blood pressure readings." The board continued: "Several weeks after this incident, the [plaintiff] presented to Blumberg on January 30, 2008; his blood pressure readings at that office visit were 140/94 and 148/96.[3] The [plaintiff] recalled that Blumberg had told him he was 'in pretty good shape' after a full physical and suggested the [plaintiff] either follow the DASH diet and lose weight or go on medication to control his blood pressure. . . . Blumberg also instructed the [plaintiff] to purchase a blood pressure monitor and to schedule a follow-up appointment in six weeks. The [plaintiff] testified that once he had modified his diet and lost weight, his blood pressure came down to 120/80 'almost consistently.' . . . The [plaintiff] followed up with Blumberg on April 4, 2008; the doctor was pleased with the [plaintiff's] blood pressure readings and the fact that the [plaintiff] had lost weight. As of the date of the formal hearing, the [plaintiff] was continuing to monitor his blood pressure three to five times per week; he had regained some weight primarily because of inactivity after falling off a roof at home and injuring his back.

"On January 6, 2012, at approximately 3 a.m., the [plaintiff] presented to the emergency room at Greenwich Hospital with a severe headache. The [plaintiff] was advised that he had an issue with high blood pressure and he remained overnight in the cardiac care unit where he was placed on a Beta blocker. His blood pressure was brought under control and he was prescribed Benacar, which he was still taking at the time of the formal hearing. The [plaintiff] indicated that subsequent to his visit with Blumberg in December, 2009, and prior to January, 2012, no doctor had expressed concern about his blood pressure or prescribed medication for it.

"At his deposition, Blumberg testified that the [plaintiff] had presented to him on January 30, 2008, after having been told his blood pressure was slightly elevated sometime during the prior year. The [plaintiff] said that he had been told two weeks before that his blood pressure was 165/100 and he was requesting a review of his laboratory results. The [plaintiff's] blood pressure readings on January 30, 2008, were 140/94 on

the left arm and 140/96 on the right arm, which readings the doctor considered mildly hypertensive.[4] The doctor indicated that the elevated readings taken two weeks before were hypertensive. The [plaintiff's] [electrocardiogram] was normal. The doctor testified that he informed the [plaintiff] of his findings and told him he could either: (1) try the DASH diet, lose weight, and monitor his blood pressure for the next two months; or (2) go on medication. The [plaintiff] decided to try to implement the lifestyle changes rather than starting medication.

"Blumberg also performed an echocardiogram on the [plaintiff] at Greenwich Hospital on March 21, 2008 which demonstrated a 'mildly increased left atrial diameter, mild aortic root enlargement, a trace of mitral regurgitation, a slightly increased left ventricular diastolic diameter, and normal ejection fraction.' . . . . Blumberg explained that the initials 'HTN' in the 'Indications' section of the report represent the reason for the test, not the diagnosis, and he conducted the echocardiogram in order to determine whether the [plaintiff] suffered from hypertension and, if so, whether his heart showed any damage from sustained hypertension. Blumberg opined that the echocardiogram 'was not diagnostic of any sustained hypertension at that time.' . . .

"The [plaintiff] returned to Blumberg in April, 2008 and his blood pressure readings at that visit were still 140/80.[5] Blumberg advised the [plaintiff] to come back in four months to recheck. The [plaintiff] returned in December, 2009; at that time his weight had dropped from 269 to 250 pounds and his blood pressure was 142/80. Blumberg ordered additional blood tests, and the results demonstrated that the [plaintiff] was 'at the lowest risk of heart disease.' . . . Under cross-examination, Blumberg testified that the blood pressure readings taken by the [plaintiff] at home were probably more accurate than the readings taken at the doctor's office because the [plaintiff] [who was a certified EMT] was experienced at taking blood pressure readings and was likely more relaxed at home. Blumberg explained that when a patient exhibits consistently high blood pressure readings, a diagnosis of hypertension is warranted, but when the readings are variable, the patient is considered to have 'labile hypertension.' . . . Blumberg testified that when the [plaintiff] returned for follow-up visits in April, 2008 and December, 2009, he was not hypertensive.

"Martin Krauthamer, M.D., was retained as a [defendant's] examiner and issued a report dated January 28, 2013, based on a review of the medical records. At his deposition, Krauthamer opined that the [plaintiff] had begun exhibiting elevated blood pressure readings in July, 2003. Krauthamer found it particularly significant that the [plaintiff] had exhibited elevated blood pres-

sure even while under sedation during a colonoscopy. Krauthamer noted that Concentra examinations conducted in 2007 through 2012 reported elevated blood pressure readings, and testified that Blumberg 'obviously made a diagnosis of concern about blood pressure, if not an actual diagnosis of hypertension in that he offered him some options.' . . . Krauthamer also stated that the [plaintiff's] blood pressure readings on January 30, 2008, along with the elevated readings taken two weeks previously, '[meet] the criteria for a diagnosis of hypertension even if Dr. Blumberg did not write one on the paper.' . . .

"In addition, Krauthamer testified that Blumberg's reference to the [plaintiff's] 'borderline hypertension,' which occurred at Blumberg's deposition and does not appear in his January 30, 2008 office notes, is not an actual JNC 7 diagnosis. . . . Krauthamer opined that according to the JNC 7 standards in effect on January 30, 2008, the [plaintiff] would fit into the category of 'Stage 1' hypertension. However, Krauthamer also noted that the [plaintiff] 'seemed to have a hypertensive response to situations' . . . by which he meant that in addition to having elevated blood pressures while at rest, the [plaintiff] also had elevated blood pressures 'when he was seeking medical care for a problem.' . . . Krauthamer indicated that he was never provided with documentation of the [plaintiff's] home blood pressure readings but recalled that those readings were normal.

"Having heard the foregoing, the trial commissioner determined that Blumberg's deposition testimony was consistent with the [plaintiff's] testimony at trial that he was never diagnosed with hypertension by Blumberg. The trial commissioner concluded that Blumberg's testimony that the [plaintiff] was 'borderline' hypertensive on January 30, 2008 . . . also [was] consistent with the flexible treatment options the doctor offered to the [plaintiff]. The trier found that Blumberg's testimony reflected that he continued to treat the [plaintiff] for two years and never diagnosed hypertension or prescribed medication for [it] because he believed that the dietary restrictions being followed by the [plaintiff] were working and the normal blood pressure readings taken by the [plaintiff] at home more accurately reflected the [plaintiff's] blood pressure than the readings taken in Blumberg's office. The trial commissioner also noted that the phrase '[b]orderline hypertension,' by its very name, implies that the [plaintiff's] condition 'has not yet risen to the level of hypertension' . . . and found irrelevant the issue of whether the terminology used by Blumberg was consistent with JNC standards. Rather, the trial commissioner, citing *Ciarlelli* v. *Hamden*, 299 Conn. 265 [8 A.3d 1093] (2010), identified as the proper mode of inquiry the determination as to 'when the [plaintiff] was told that he had a diagnosis of hypertension.' . . .

"The trial commissioner acknowledged that the [plaintiff] was a certified EMT who 'probably knew he was flirting with a diagnosis of hypertension in the years leading up to his diagnosis in 2012.' . . . However, the [trial commissioner] also indicated that she did 'not equate the ability of an EMT to identify a high blood pressure reading with the ability of a doctor to definitively diagnose hypertension.' . . . Relative to the testimony offered by Krauthamer, the trial commissioner recognized that, 'Krauthamer would not have been so flexible and would have rendered a diagnosis of hypertension much sooner than Dr. Blumberg. Whether Dr. Blumberg was right or wrong, it would be fundamentally unfair to punish the [plaintiff] for any error in judgment of his treating physician.' . . . The trial commissioner concluded that because the [plaintiff] was not formally diagnosed with hypertension until January 6, 2012, when he presented to Greenwich Hospital, the [plaintiff] was entitled to file his claim between January 6, 2012, and January 6, 2013, and the [plaintiff's] notice of claim for benefits pursuant to § 7-433c . . . dated April 9, 2012, was therefore timely." (Citations omitted; footnotes in original.) The trial commissioner ordered that the defendant assume responsibility for paying the plaintiff's workers' compensation claim.

The defendant appealed from the trial commissioner's decision to the board, challenging the trial commissioner's finding and award on the grounds that the trial commissioner (1) made conclusions that were legally inconsistent with the subordinate facts found, (2) erred as a matter of law by concluding that the plaintiff had filed a timely claim under § 7-433c, and (3) erred as a matter of law by concluding that the plaintiff had established a compensable claim under § 7-433c.[6] Specifically, the defendant argued to the board that the trial commissioner's conclusion that the plaintiff's claim for benefits was filed timely was erroneous because it should have concluded that the one year limitation period for filing a claim under § 7-433c began to run on January 30, 2008, when Dr. Blumberg gave the plaintiff the option of taking medication for his high blood pressure.

The board noted that because the defendant did not file a motion to correct, the board was required to accept the validity of the facts found by the trial commissioner and its review was limited to how the trial commissioner applied the law. See Regs., Conn. State Agencies, § 31-301-4; *Samoya* v. *Gallagher*, 102 Conn. App. 670, 675, 926 A.2d 1052 (2007). Thus, the board focused its analysis on *Ciarlelli* v. *Hamden*, supra, 299 Conn. 265, in which our Supreme Court held, inter alia, "that the one year limitation period for claims under § 7-433c begins to run only when an employee is informed by a medical professional that he or she has been diagnosed with hypertension." Id., 300. After ana-

lyzing the subordinate facts before the trial commissioner in light of *Ciarlelli*, the board concluded that the "the instant record clearly demonstrates that prior to January, 2012, neither Blumberg nor any other physician ever rendered to the plaintiff a formal diagnosis of hypertension as contemplated by *Ciarlelli* . . . ." Accordingly, the board affirmed the trial commissioner's decision. This appeal followed.

We set forth our standard of review. "[T]he conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. . . . Neither the . . . board nor this court has the power to retry facts. . . . Thus, we are bound by the subordinate facts found by the commissioner unless those findings are clearly erroneous. . . . A factual finding is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . Furthermore, it is well established that, as a general matter, [i]t is the [trier of fact's] exclusive province to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony . . . ." (Citations omitted; internal quotation marks omitted.) *Brymer* v. *Clinton*, 302 Conn. 755, 764–65, 31 A.3d 353 (2011).

In *Ciarlelli*, our Supreme Court clarified the standard for assessing when the one year limitation period provided by § 31-294c (a)[7] begins to run for claims filed pursuant to § 7-433c. In addition to holding that hypertension should be deemed an "accidental injury definitely located in time and place" as opposed to a "repetitive trauma injury" for purposes of applying the one year limitation period prescribed by § 31-294c; *Ciarlelli* v. *Hamden*, supra, 299 Conn. 280, 285; our Supreme Court held that this same one year limitation period begins to run only when the plaintiff is informed by a medical professional that he or she has been diagnosed with hypertension.[8] Id., 300. Our Supreme Court concluded by stating that, although the issue of when the one year limitation period pursuant to § 31-294c begins to run remains a question of fact for the trial commissioner, "evidence that an employee merely knew of past elevated blood pressure readings, or was advised by his or her physician to make certain lifestyle changes in response thereto, is not sufficient to trigger the limitation period in the absence of evidence that the employee formally had been diagnosed with hypertension by a medical professional and advised of that diagnosis." Id., 301. Our Supreme Court stated in a footnote that "this standard is not so inflexible as to require a finding in all cases that the medical professional used the term 'hypertension' in communicating

the diagnosis to the employee." Id., 301 n.18. Thus, in essence, our Supreme Court adopted a totality of the circumstances test that puts substance before form when determining whether a plaintiff had been diagnosed with hypertension as opposed to having been put on notice that he had high blood pressure readings.

More recently, in *Roohr* v. *Cromwell*, 302 Conn. 767, 31 A.3d 360 (2011), our Supreme Court applied its holding in *Ciarlelli* to a case with underlying facts that are materially similar to the facts underlying the present appeal. Thus, our Supreme Court's analysis in *Roohr* guides our resolution of this appeal. In *Roohr*, the plaintiff, Thomas Roohr, was a municipal police officer who successfully passed a preemployment physical examination that revealed no evidence of hypertension or heart disease. Id., 769. On April 29, 2002, nearly twenty years after Roohr had been hired as an officer, Roohr began to see a new primary care physician. During his first visit on April 29, 2002, Roohr recorded elevated blood pressure readings. Id., 770. Roohr continued to visit the primary care physician throughout 2002 and 2003 and he continued to record elevated blood pressure readings. Id. Finally, during a visit on October 17, 2003, after Roohr recorded another elevated blood pressure reading, his primary care physician prescribed him medication for hypertension. Id. Roohr thereafter filed a claim for § 7-433c benefits in March, 2004. Id. The defendant town of Cromwell moved to dismiss Roohr's claim as untimely under § 31-294c (a), arguing that Roohr had been diagnosed with hypertension on April 29, 2002. Id.  In a subsequent deposition, Roohr's primary care physician testified that during Roohr's initial visit on April 29, 2002, he had *diagnosed* Roohr with hypertension and had discussed the condition with him, despite not having prescribed him medication for treatment. Id. The physician also testified that during Roohr's subsequent office visits, he recommended that Roohr make lifestyle changes to help address his high blood pressure. Id. Roohr testified before the trial commissioner that he did not remember the physician diagnosing him with hypertension on his initial April 29, 2002 visit, but that he did recall talking about diet, weight loss, and possibly his blood pressure. Id. Thus, Roohr averred that his March, 2004 claim was timely because he had not been diagnosed with hypertension until the date that his physician prescribed him medication on October 17, 2003. Id., 771. The trial commissioner found that Roohr had been formally diagnosed with hypertension on April 29, 2002, and concluded that his claim for benefits was therefore untimely. Id. The compensation review board affirmed the decision and Roohr appealed. Id., 768–69.

On appeal, our Supreme Court affirmed the decision of the board upholding the trial commissioner's dismissal of Roohr's claim because the evidence clearly showed that he had been diagnosed with hypertension

during his April 29, 2002 visit to his primary care physician. Id., 771. Most notably, our Supreme Court noted that "[t]here is nothing in *Ciarlelli* to support [Roohr's] contention that a diagnosis of hypertension is insufficient to trigger the one year limitation period of § 31-294c (a) unless the diagnosis is accompanied by a prescription for hypertensive medication. Because [Roohr's] physician testified, and the commissioner expressly found, that [Roohr] was, in fact, diagnosed with hypertension and informed of that diagnosis more than one year before he filed his claim, the board properly upheld the commissioner's dismissal of [Roohr's] claim for benefits under § 7-433c." Id.

Turning to the present appeal, we conclude that the board's decision to affirm the trial commissioner's finding and award was correct in law and adequately supported by facts in evidence. We reach this conclusion because the trial commissioner's finding that the plaintiff was not formally diagnosed with hypertension until January 6, 2012, is clearly supported by evidence in the record. Furthermore, the trial commissioner's finding does not leave this court with the "definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Brymer* v. *Clinton*, supra, 302 Conn. 765.

Unlike the primary care physician in *Roohr*, Dr. Blumberg testified in his deposition in the present case that he did *not* diagnose the plaintiff with hypertension during the January 30, 2008 visit. See *Roohr* v. *Cromwell*, supra, 302 Conn. 770 ("[i]n his testimony, [Roohr's primary care physician stated] that he diagnosed [Roohr] with hypertension on April 29, 2002, and discussed the condition with him [at that time]" [internal quotation marks omitted]). Unlike Roohr, the plaintiff in this case testified that "he recalled that Blumberg told him he was 'in pretty good shape' " when he gave the plaintiff the option of pursuing the DASH diet or going on medication during his January 30, 2008 visit. Despite the fact that Dr. Blumberg instructed the plaintiff during that visit to purchase a blood pressure monitor and to schedule a follow-up appointment, the plaintiff was able to lower his blood pressure shortly thereafter through diet and exercise, as evinced by his echocardiogram results on March 21, 2008, which Dr. Blumberg opined were "not diagnostic of any sustained hypertension." Finally, the plaintiff in this case was a trained EMT who had a basis of knowledge that elevated blood pressure readings do not necessarily amount to a formal hypertension diagnosis, which supported a finding that the plaintiff was aware that he had not yet received a formal diagnosis of hypertension during his January 30, 2008 visit to Dr. Blumberg.

Although the defendant argues that the mere fact that Dr. Blumberg offered the plaintiff the option of going on medication during his January 30, 2008 visit strongly

suggests that the plaintiff received a diagnosis of hypertension, we conclude that Dr. Blumberg's offer of the medication option to the plaintiff was not tantamount to a diagnosis of hypertension for purposes of §§ 31-294c (a) and 7-433c. See *Roohr* v. *Cromwell*, supra, 302 Conn. 771 (concluding that prescription for medication is not determinative of whether there was formal diagnosis of hypertension by medical professional). We observe that this conclusion may, at first glance, appear to be somewhat inconsistent with our Supreme Court's statement in *Ciarlelli* that "evidence that an employee was prescribed antihypertensive medication for the treatment of high blood pressure related to hypertension . . . likely would support a finding that the employee formally had been diagnosed with hypertension . . . ." *Ciarlelli* v. *Hamden*, supra, 299 Conn. 301 n.18. Nevertheless, our review of the totality of the circumstances surrounding the plaintiff's January 30, 2008 visit does not support the conclusion that he received a formal diagnosis of hypertension during that visit. The plaintiff was *merely offered the option* of going on medication as opposed to *being prescribed* medication during that visit. When this evidence is coupled with evidence that (1) Dr. Blumberg told the plaintiff that he was "in pretty good shape" during that same visit, (2) the plaintiff lowered his blood pressure readings to normal levels through diet and exercise shortly after that visit, (3) the plaintiff's March 21, 2008 echocardiogram results were not indicative of hypertension, and (4) no other medical professional diagnosed the plaintiff with hypertension prior to January 6, 2012, we are left with the firm conviction that the board's affirmance of the trial commissioner's finding that the plaintiff was not formally diagnosed with hypertension until January 6, 2012, was proper. Accordingly, we agree that the plaintiff's claim for benefits was timely filed.

The decision of the Workers' Compensation Review Board is affirmed.

In this opinion the other judges concurred.

[1] In addition to the city of Stamford, which was the plaintiff's employer at the time that he filed the workers' compensation claim, PMA Management Corporation of New England is listed as a defendant in this appeal. PMA Management Corporation of New England is a third party administrator for the city of Stamford. For convenience, all references to the defendant in this opinion refer solely to the city of Stamford.

[2] In its brief, the defendant specifically claims that the board's decision should be reversed because (1) the trial commissioner who issued the finding and award for the plaintiff's hypertension benefits misapplied the standard for the statute of limitations for claims involving hypertension benefits under § 7-433c, and (2) the trial commissioner's conclusions regarding the plaintiff's hypertension diagnosis were unreasonably drawn from, and legally inconsistent with, the subordinate facts found. Furthermore, the defendant, in both its brief and reply brief, recites the issues on appeal as follows: (1) Whether the board erred in affirming the trial commissioner's finding and award determining that the plaintiff sought benefits for hypertension in a timely fashion and that it had jurisdiction over the claim; (2) whether the trial commissioner erred as a matter of law by not concluding that the plaintiff was not required to file a claim for hypertension benefits within one year of his primary care physician offering him the option of going on hypertensive medication on January 30, 2008; (3) whether the trial commis-

sioner's conclusion that the claim was not barred by the statute of limitations is legally inconsistent with the subordinate facts; and (4) whether the trial commissioner's conclusion—that the plaintiff's primary care physician's diagnosis of "borderline hypertension" indicated that the plaintiff's condition had not yet constituted a formal diagnosis of hypertension—was unreasonably drawn from and legally inconsistent with the subordinate facts. Although the defendant presents the aforementioned claims on appeal in this fashion, we interpret the substance of the defendant's appeal to encompass one issue: Whether the board's affirmance of the trial commissioner's finding and award should be reversed because the trial commissioner's findings and conclusion that the plaintiff filed a claim for § 7-433c benefits in a timely fashion resulted from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them.

[3] "Martin Krauthamer, M.D., the [defendants'] expert, testified that according to the 'JNC 7,' blood pressure readings of less than 120/80 are considered normal, readings between 120-139/80-89 are considered pre-hypertensive, readings between 140-159/90-99 are considered 'Stage 1' hypertension, and readings of 160/100 or above are considered 'Stage 2' hypertension. . . . The JNC publications are compiled periodically by a panel of cardiologists and outline the recommendations of these cardiologists for the diagnosis and treatment of hypertension. As such, the JNC guidelines are 'considered an authoritative source within the field of cardiology.' " (Citation omitted.)

[4] "Blumberg testified that the standards in effect in 2008 classified normal blood pressure as 90 or below for the diastolic reading and 140 or below for the systolic reading."

[5] "The [plaintiff] told Blumberg that the blood pressure readings taken at home were running 125 to 132 over 65 to 80."

[6] General Statutes § 7-433c (a) states in relevant part: "Notwithstanding any provision of chapter 568 or any other general statute, charter, special act or ordinance to the contrary, in the event a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment, and from the municipal or state retirement system under which he is covered, he or his dependents, as the case may be, shall receive the same retirement or survivor benefits which would be paid under said system if such death or disability was caused by a personal injury which arose out of and in the course of his employment, and was suffered in the line of duty and within the scope of his employment. If successful passage of such a physical examination was, at the time of his employment, required as a condition for such employment, no proof or record of such examination shall be required as evidence in the maintenance of a claim under this section or under such municipal or state retirement systems. The benefits provided by this section shall be in lieu of any other benefits which such policeman or fireman or his dependents may be entitled to receive from his municipal employer under the provisions of chapter 568 or the municipal or state retirement system under which he is covered, except as provided by this section, as a result of any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability. . . ."

[7] General Statutes § 31-294c (a) provides in relevant part: "No proceedings for compensation under the provisions of this chapter shall be maintained unless a written notice of claim for compensation is given within one year from the date of the accident or within three years from the first manifestation of a symptom of the occupational disease, as the case may be, which caused the personal injury . . . ."

[8] The standard that our Supreme Court delineated in *Ciarelli* abrogated the prior standards as set forth in this court's decisions in *Pearce* v. *New Haven*, 76 Conn. App. 441, 819 A.2d 878, cert. denied, 264 Conn. 913, 826 A.2d 1155 (2003), and *Arborio* v. *Windham Police Dept.*, 103 Conn. App.

172, 928 A.2d 616 (2007). In *Pearce*, this court held that the limitation period for a firefighter's filing notice of claim and notice of injury for heart and hypertension benefits began to run when he learned of his elevated blood pressure readings, not when he was diagnosed with hypertension and placed on medication. *Pearce* v. *New Haven*, supra, 446–50. In *Arborio*, this court followed its holding in *Pearce* but it concluded in that case that a plaintiff's knowledge of high blood pressure readings and results of a stress test at several office visits was insufficient to support the trial commissioner's and the board's conclusion that the plaintiff had an accidental injury that required him to notify his employer and to file a claim for benefits under § 7-433c. *Arborio* v. *Windham Police Dept.*, supra, 186–88.

---